Bsevard, X,
delivered tire opinion of the court in these terms» *191 This was an action on a policy of insurance tried before Tkeze-vant, J., in Charleston, on forty negro slaves, valued at two hundred and fifty dollars each, at and from St Thomas’s to Charleston. It appeared in evidence at the trial, that the sloop Sydney, with the negroes in question on board, sailed from St. Thomas’s on the 27th day of February, 1805; that on the fifth of March, she had to labor with a heavy head sea, by which she was considerably strained ; and the heavy head sea continuing, on the next day the starboard chain-plates gave way, and also the step of the mast, which went overboard, with all sails set, and tore away all the starboard side of the deck ; that all hands were employed to clear the wreck, for the safety of the sloop, cargo, and erew; and that they bore away for the Havana under a jury-mast; that on the 9th, they fell in with the ship Charlotte, of Bristol, bound to Havana, the master of which, consenting to receive the cargo and crew of the Sydney, the same were transferred, and the ship arrived safe at Havana on the 17th, having abandoned the Sydney, at sea. Among the documents produced in evidence, was a letter addressed to the plaintiff by his captain, dated St. Thomas, 23d February, in which he says, “ I arrived here the 20th, twenty-four days from Gambia. . I have on board forty slaves consigned to you. I came here for the purpose of getting some water, and some repairs done to the vessel.” But no proof was adduced that the sloop was repaired. Another letter was given in evidence, written to the plaintiff, from Widow, Poey and Hermandez, dated Havana, March the 19th, stating that the plaintiff’s captain, Gardner, had called on them, as correspondents of the plaintiff, to receive thirty-nine negroes, part of the cargo of the sloop Sydney, taken up off Abaco, by the ship Charlotte, and had requested them to receive the said negroes, aud to dispose of them' on the plaintiff’s account, or on account of the underwriters, paying him the freight stipulated by the bill of lading, and that they would do so, and would inform the plaintiff of the condition of the slaves as soon as they should be received. It appeared further in evidence, that the plaintiff wrote on the 29th an answer to this letter, in which he acknowledged the receipt of it, and says: “As the negroes are insured at Charleston, 1 am at some loss what orders to-give you respecting them. 1 request that no time may be lost to obtain from Capt. Gardner a protest, in order to recover from the underwriters ; but as negroes are bearing a good price, I do not expect much loss at present, I cannot say any thing respecting the-returns, as I mean that the underwriters may have any advantage which may arise thereon; so soon as the protest arrives* *192 I can inform you of the determination of all concerned, f mllst suppose that whoever is, to receive the returns, that sugars shipped would yield some profit.” In another letter., the plaintiff writes to Gardner, that if any of the negroes were lost by the accident, to be full in his protest. Another letter,in reply to this, from Gardner, states, that be has inclosed Iiis protest, which had been made out previous to the receipt of the plaintiff’s letter, and hopes it will answer; and in a postscript, adds, that the negroes had been ordered to be sold on account of the underwriters, and those concerned. In another letter, which was given in evidence, from Widow, Poey and Her-mandez, to the plaintiff, dated 31st March, they inform him that they had received thirty-nine negroes; that only sis of them were merchantable. That they inclose a declaration made by four gen* tlemen, well versed in the African business, which they had requested, as they could not take on themselves to effect the sales of the slaves, without such a document. The declaration spoken of in this letter, was in evidence, and is to this effect: That the subscribers bad carefully examined thirty-nine new negroes, consisting of twenty-six males, and thirteen females, landed from the ship Charlotte, as part of the cargo of the sloop Sydney ; and they were of opinion that only six of them were merchantable; that other six or eight of them might become so, if properly fed and attended to; but that the remainder of them were altogether un-i saleable, owing to their advanced age, and crippled condition. A Mr. Jouve, one of the inspectors, who signed this declaration, was examined as a witness at the trial, and from the report of the judge, who presided on the trial, it appears that his testimony was to the following effect: That the Spaniards do not like old negroes, and consider those old who are but middle aged. That at the time the negroes were sold, it was difficult to procure freight for a vessel bound to Charleston, and only at very extravagant rates, from the dread of being captured by French privateers ; and that considering the deplorable condition of the negroes, humanity dictated a sale of them at Havana. It further appeared from the account of sales of the negroes by Widow, Poey and Hermandez, that the he.-groes were sold at Havana, viz., thirty-seven sold, three having; died, for four thousand six hundred and eighty-five dollars. The plaintiff claimed the sum of ten thousand dollars, for forty negroes, valued at two hundred and fifty dollars each, and gave credit for the amount of the sales, deducting for freight, which was payable out of the proceeds of the sales, the sum of twelve hundred dollars, *193 and also for salvage, and other expenses, the sum of six hundred and seventy-nine dollars and seventy-five cents, which reduced the net proceeds oí the sale to two thousand eight hundred and five dollars and twenty-five cents. This, deducted from the valuation in the policy, left a balance of seven thousand one hundred and ninety-four dollars and seyenty.five cents, which the plaintiff claimed ; but he allowed an abatement of two per cent.,, according to the terms of the policy, reducing the balance claimed, to seven thousand and fifty dollars and eighty.five cents. It iurlher appeared in evidence, that the plaintiff offered to abandon to the underwriters about the 10th of May, 1805.
The verdict is in favor of the plaintiff, for the balance claimed by him.
The motion before this court is, to set aside the verdict, which has been obtained, as for a total loss, and to grant a new trial. In support of this motion, it has been contended, that under the cir. cumstances of the case, the plaintiff was not entitled to abandon to the insurers ; but if he was at any time entitled to abandon, he forfeited,' or waived his right, or privilege, to do so, by his own neglect, or wilful delay, in not signifying to the underwriters his intention to abandon within a reasonable time after he had received intelligence of the accident, and misfortunes which had befallen the vessel, and the cargo insured. In opposition to this, it has been argued for the plaintiff, that he was under no obligation to make his election, whether to abandon,, or not, until he could be fully informed with regard to the extent pf the injury occasioned to the property insured, and of the loss thence arising, in consequence of the accidents and misfortunes which happened on the voyage; and that this could not be ascertained immediately; that it was necessary to await the result of a further inquiry and investigation into the facts and circumstances, to be able to decide satisfactorily on the right to abandon ; as that could not be done, till it could be ascertained whether the damage sustained was so. great as to have frustrated the object of the adventure, by diminishing the value of the negroés insured so much, as to have rendered the adventure unworthy of further pursuit. It has been further argued, in behalf of the plaintiff, that inasmuch as it did appear in evidence that another vessel could not be procured at Havana to take the negroes to Charleston, therefore the voyage was at an end ; that the object of it was totally defeated, and the plaintiff was clearly intitled to abandon. The protest, letters, and other documents which were produced in evidence at the trial, together with the testimony of *194 Mr. Jouve, may be very fairly presumed to have disclosed every thing (hat could have been produced, or that the case admitted of, to suPP°rt the claim'of the plaintiff. If any part of this evidence can be supposed to have proceeded from partiality, or undue influ. ence, yet it cannot be supposed, because there is no color of reason for supposing that this undue bias, or partiality, has operated to the prejudice of the plaintiff, and in favor of the defendants. On the contrary, there are good reasons for 'believing, that nothing, has been omitted in the evidence adduced in favor of the plaintiff, which could with truth have been unfolded, to enable him to support his demand. There is no reason, however, for supposing the evidence given in his favor was not in all respects true, to the best of the knowledge and belief of those whose evidence was produced on the occasion. It must be recollected that the plaintiff expressly required that the protest might be full and particular, in or. der that he might recover against the underwriters. The protest is so full as to comprehend the adventures of a preceding voyage from the coast of Africa to St. Thomas’s. The captain’s letter to the plaintiff, dated the 23d of February, from St. Thomas’s, informs him of his arrival there on the 20th, twenty-four days from Gambia, with 40 slaves. It does not appear in what condition the slaves were on their arrival, or at the time when the insurance was effected; nor whether they were all alive when the policy was signed, or at the time of the sloop’s departure from St. Thomas’s. The plaintiff’s correspondents write to him from Havana on the 19th of March, to inform him that Gardner had called on them to receive thirty.nine negroes ; and in their letter Of the thirty-first of the same month, they inform him of their having received thirty-nine negroes. From this evidence, it may be inferred that one of the negroes insured died in the course of the voyage; though, from any thing that appears certainly to the contrary, the death or loss of this negro may have happened prior to the commencement of the voyage from St. Thomas’s. But let it be admitted, that he died on the voyage, still there is no evidence to authorize the presumption, that his death was occasioned by any of the perils enumerated in the policy. -The most reasonable presumption is, that he perished by natural mortality, which is an accident expressly excepted from insurance by the terms of the policy. As 'thirty-seven of the slaves appear to have been sold, and as nothing particular has appeared in relation to the rest, we may conclude that Jwo others died by natural mortality. If they had perished in consequence of any of the perils insured against, it is highly *195 probable the manner and circumstances of their death would have been particularly detailed in evidence. From the evidence which was given, there is perhaps as much reason to presume that their death was occasioned in consequence of hardships they had suffered on the voyage from Gambia to St. Thomas’s, as that they died in consequence of the misfortunes which happened on the voyage from St. Thomas’s. Upon this point, there was no evidence which could be relied on. It must have been mere blatter of conjecture. But if the evidence had been sufficient to establish the fact, that the loss of these two negroes was a loss within the policy, and properly chargeable to the underwriters, yet it was not such a loss as intitled the plaintiff to abandon. The thirty-seven slaves which were sold, it appeared, were all unmerchantable at the time of the sale, except six only, and these were sold for good prices. Six or eight others were represented to the plaintiff, by their correspondents, as being capable of being rendered merchantable, by proper care and feeding. -The remainder were represented to be old and crippled. Indulging every presumption in favor of the plaintiff, how can it be fairly collected from this evidence that the value of the negroes were diminished one half their value, by the perils insured against! How does it appear that they were deteriorated on the voyage from St. Thomas’s ? No circumstances were stated in evidence from whence it can be fairly inferred that any material deterioration was produced in consequence of the misfortunes of the passage from St. Thomas’s to the Havana, by'wounds, bruises, or other accidents, or by any uncommon hardships or sufferings, from ill treatment, or otherwise. It does not appear that they suf. fared any hardships, or met with any misfortune, after they were taken on board-the Charlotte. From the time of the sloop’s meeting the heavy head sea, spoken of in the protest, until the cargo was transferred to the Charlotte, is included an interval of three or four days only.. Besides, it did not appear that the negroes, though valued at two hundred and fifty dollars each, were really worth so much, nor that they had in fact suffered any diminution in their value, between the commencement of the voyage and the sale. But if any such diminution can be presumed, the extent thereof is quite uncertain, as well as the particular causes thereof. The comparative value of the negroes at the commencement of the adventure insured, and at the time of the sale; or rather, the value at the time when the misfortunes of the voyage began, and after they were over,' ought to be ascertained, in order to estimate the loss for which the defendants are responsible. Unquestionably, the evi- *196 ^etlce §*ven Jury on ^ie tr‘u^ was not: sufficient to authorize t0 say that the difference of value produced by any of the perils mentioned in the policy was such as to entitle the plaintiff, ^or cause> ant^ als0 by reason of salvage, and other expenses, occasioned by those perils, to abandon as for a total loss. Moreover, it is necessary to observe that the insurer is not answerable for consequential damages, or for any losses, which are not the immediate consequences of some of the perils insured against. He is not responsible for remote consequences, or such as do not follow directly from those accidents and misfortunes, which are intended to be guarded against by insurance. Now, in this case, the evidence was manifestly insufficient to satisfy a conscientious and intelligent jury that there was any considerable damage done, or loss sustained, directly resulting from any off the perils insured against. Indeed, it seems difficult to form any opinion what loss ■was sustained in this case, and a jury might be much at loss to ascertain it, considering it in the light of partial loss, which is the light in which it ought to be regarded. It was quite clear that the evidence of loss was not sufficient to authorize the plaintiff to abandon. See 1 Marshall, 134, 161, 199.
It has been argued, however, that because the sloop was lost, the voyage was also; and especially, as there was no other vessel to be procured to transport the cargo to the port of delivery ; and that upon this ground the plaintiff had a right to abandon. But it does not appear that any endeavors were made, or due diligence used, to procure any vessel to complete the voyage. The ship belonged to the plaintiff. It was the duty of the master to have procured another ship, if he could, to convey the cargo to the port of destination. The insurers are not answerable for this neglect of the master, in a case like this, where the master acts under immediate instructions from the assured, who is the owner. The negroes were delivered to the plaintiff’s agents, and were sold very soon after their arrival at Havana. Mr. Jouve, indeed, said, that in his opinion, another vessel could not have been procured to take the cargo to Charleston, without paying a very extravagant price for it, because of the dread of capture from French privateers. But this evidence was insufficient to excuse the master, and make the insurers liable : and besides, it does not appear that the master, or the plaintiff, intended, or wished to prosecute the voyage. The plaintiff seems to have been willing to try the chance of the Havana market, which at that time was a pretty good one, and if it should turn out favorable, to proceed against the underwriters for a partial loss only; *197 and if it should turn out unfavorable, contrary to his expectations, then to convert the partial loss, into a total loss by abandonment. This intention is fairly deducible from his own letters, which were in evidence. It is the opinion of the court, that if the plaintiff had , . . , a right to abandon, he forfeited that right by failing to give due and reasonable notice to the insurers of his intention to do so, after receiving advice of the misfortune which befell the sloop at sea. If he was intitled to abandon, he should have abandoned at once, and should not have waited and made his election after the sale of the negroes and the payment of salvage,-and other expences ; for the right to abandon cannot depend upon events which take place after the peril is over, and the property insured is in safety. See 7 East. 43.
Not;. If the voyage be lost, or not worth pursuing; if the salvage he high | if further expense be necessary ; if the insurer will not, at all events, undei take to pay that expense; if the damage exceed half the value of the thing insured; or if the voyage be interrupted, so that the pursuit of it would not be worth the freight, the insured may abandon. See Marsh. 498.
As between the owners of the ship, and the owners of the cargo, in the case ef a total loss, no freight is due; but as between them, no loss is total where part of the property is saved, and the owner takes it to his own use. If the value of the goods be restored in money, it is the same as the goods, and freight is due ¿ira rata, itineris. But as between the insured and the underwriters upon the cargo, it is a contract of indemnity, and the latter have nothing to do with the freight. The owner of the ship has a lien for his freight; but in the case of a loss, really total, no freight is due. See Marsh. 628. [If the insured, in the case of ail insurance upon goods, he being the owner of the goods, abandon to tbo underwriters, the underwriters are liable for the payment of freight prorata, if any of the goods are restored; because the ship owner has a lien ou the goods for his freight In the ease above reported, Teasdale was owner both of the ship and cargo, lie was intitled, as owner of the ship, to freight pro rate out of the value of the go ds abandoned.]
*197 It was contended in the argument, that the verdict ought to be set aside, because, the plaintiff had no right to have the freight pro rata itineris included in the verdict. But we are of opinion, that provided he was intitled to abandon, he was also intitled to recover the freight for the portion of the voyage performed; because, upon abandonment, the underwriters, if they receive any part of the goods, or their value, are liable for the freight of them. The goods are always chargeable for their freight; and when goods are abandoned to the insurers, the insurers of course are chargeable out of the goods for their freight. In this case, if the plaintiff had a right to abandon, the common agent of all parties concerned had a right to do the best he could with the cargo, until the underwriters could give instructions about them ; and as the plaintiff gave credit for the sales of the cargo as so much to be deducted from the value in the policy, he had a right to deduct the freight from the amount of sales, together with other charges on the goods, as he was ownor of the vessel, and stood his own insurer as to freight, or to whoever may be intitled to freight, for the part of the voyage performed.
New trial granted.
When the loss is total, and the policy is a valued one, the insured is intitled to receive the whole sum insured, subject to such deductions as may have been agreed to be made by the policy in case of loss. See Marsh. 530. 2 Burr. 1171.
The captain of the ship, from the nature of his situation, has an implied authority, not only from the insured, but also from the insurers, and all others interested in the ship or cargo, to do whatever he thinks most conducive to the general interest of ail concerned; and they are all bound by his acts, Therefore, if the ship be disabled by stress of weather, or any other peril of the sea, the captain may hire another vessel Or he may, upon the loss of the ship, invest the produce of the goods saved, in other goods. See Marsh 527. 1 D. and E. 6 LI. n. Marsh. 378-9. The captain is bound in such case, to do with the goods what it may be presumed the shippers would do were they present. See Marsh. 379, 132. [In this case, Teasdale v. The Insurance Company, Teasdale, the shipper, instructed the captain what to do ]
If animals he insured, and their death occasioned by any extraordinary accident, it is a loss within the policy. Not so, if it he occasioned by disease. Negro slaves arec lassed under the same head by Valin and Pothier. Marsh. 420. Q,. Whether the wagess and provisions of the seamen during the interruption by the storm are to be brought into a general average? See Marsh. 465. Beawes, 150.
As soon as the insured receives advice of a total loss, he must make his election whether he will abandon or not. If he determines to abandon, he must give the underwriters notice of this within a reasonable time after the intelligence arrives; and any unnecessary delay in giving this notice, will amount to "a waiver of his right to abandon. 1 O. and E. 616. Marsh. 509. See Park. 172. The insured cannot lie by and treat the loss as an average loss, without giving notice. If he neglecls to abandon, he adopts the acts of the captain, and is bound by them. Marsh. 527.
In this action, the plaintiff’s demand is for an indemnity. His action is founded on the nature of his damnification. It is repugnant upon a contract of indemnity to recover as for a total loss, when the final event has determined that the damnification is in truth an average loss. See 2 Burr. 1198. 1 Bl. 276. No right can vest as for a total loss, until the insured has made his election. He cannot elect before advice is received of the loss; and if that advice shews the peril tobe over, he cannot elect at all. If the thing be recovered before the-money is paid, the insured can only be intitled according to the final event. 16.
See 4 Cranch, 370, Alexander v. The Baltimore Insurance Company. Policy on. a, ship for a voyage. The loss of the voyage, as to the cargo, adjudged not to be a loss of the voyage, as to the ship. The contract is, that the voyage shall not be destroyed by the fault of the ship; that the ship shall be capable of making the voyage.
See 2 Johns. 340. Acceptance of the cargo at an intermediate port, makes the owner responsible for freight; a contract is implied from the acceptance of - the cargo; but no such presumption can arise where the goods are not carried to the port of destination, or accepted at a port short of it.